# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

| | | |
|---|---|---|
| RUSSELL C. HOGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-CV-4068-NKL |
| | ) | |
| UNITED PARCEL SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## ORDER

Plaintiff Russell C. Hogan ("Hogan") brings this lawsuit against Defendant United Parcel Service ("UPS") because UPS eliminated his job position after he reported for military service in Operation Iraqi Freedom. He filed the suit pursuant to the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301 - 4333 ("USERRA"). Before the Court are UPS's Motion for Summary Judgment [Doc. # 33] and Hogan's Motion for Partial Summary Judgment [Doc. # 38]. For the following reasons, the Court Grants UPS's motion and denies Hogan's motion.

## I.    Factual Background[1]

Hogan joined the Air Force Reserves in 1988.  In approximately 1992, he began work as a tractor-trailer ("feeder") driver for UPS.  Hogan took military leave from his job at UPS at least once a year from 2000 to 2005.

In February 2003, he took a military leave from his job at the UPS Sedalia, Missouri, facility where he had worked since 1996.  Hogan was on military leave from February 2003 to April 2004.  He had taken military leave several times prior to 2003 as well.  In July 2003, UPS officially eliminated the Sedalia feeder driver job which had been held by Hogan when he left for military duty.

### A.    Hogan's Feeder Driver Job

There were only two feeder drivers at the Sedalia facility between April 2002 and July 2003.  They were held by Hogan and feeder driver Robert DeMotte ("DeMotte"), who had more seniority than Hogan.

Before Hogan left for military leave in February 2003, his job normally involved the following work: (1) making local pickups from Sedalia customers using a feeder trailer and bringing those packages back to the Sedalia facility; (2) pulling two trailers from Sedalia to Lenexa, Kansas – one trailer with packages and one empty trailer; and (3) pulling two trailers

---

[1]  The Court has considered the parties' statements of undisputed fact which are supported by evidence. The Court deems admitted both parties' fact statements which have not been directly controverted. *See* Local Rule 56.1 ("Each fact in dispute shall be set forth in a separate paragraph, ... and, if applicable, shall state the paragraph number in the movant's listing of facts that is disputed. All facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the opposing party.").  In considering each parties' motion, the Court has drawn all inferences in favor of the non-movant.

2

with packages from Lenexa back to Sedalia. In 2002 and 2003, feeder driver DeMotte normally pulled two trailers from Sedalia to Lenexa, one with packages and one empty. Hogan's local Sedalia package pickups comprised a significant percentage of Hogan's work; the parties dispute the exact amount, but present evidence showing that the pickups took from twenty to fifty percent of Hogan's time.

### B. UPS Personnel

In 2003 and 2004, Lary Lehman ("Lehman") and Jeff Johnson were package car (brown delivery truck) drivers at UPS's Sedalia facility. They were "feeder qualified" and covered feeder drivers' jobs when those drivers were absent from work. During that time, Lehman did not have an assigned route. From February 2003, when Hogan left for military service, until July 2003, Lehman performed Hogan's job.

Hogan's "Feeder supervisor" from 2001 to 2004 was Rick Meierotto ("Meierotto"), Northwest/Northeast Missouri Feeder Supervisor. In 2003, Jim Graham ("Graham") was UPS's Package Division Manager. Regina Lause ("Lause") was the package car supervisor at the Sedalia facility; Graham was her supervisor. When Hogan left on military leave in February 2003, the Sedalia Center Manager was Laurice Phillips, a member of the Army Reserves.

During 2003, Joe Brown ("Brown") was the Feeder Scheduler for UPS's Missouri District. He worked at UPS's facility in Earth City, Missouri. His duties included scheduling feeder driver routes and trailers in Missouri. Brown's responsibilities also included adding, changing, and eliminating feeder driver routes and jobs within the feeder network. Brown's

3

job involved trying to eliminate unnecessary feeder routes and improve efficiency.

### C.     The Elimination of Work on Hogan's Route

Sometime between 2002 and 2003, Graham directed the Sedalia facility management team to research the volume of packages picked up locally on Hogan's Sedalia route. Graham indicated that he observed fewer packages coming in on the trucks from that route. Lause told  Graham that the volume had decreased, and that the local pickups could be performed by package car drivers instead of a feeder truck driver.  Lause was aware that Hogan was on military leave at the time.[2]

Sometime between March and May 2003, Graham reassigned the local pickups from Hogan's feeder driver job to Sedalia package car drivers.  He testified that he made this change because he believed it would be less costly for UPS to have package trucks make the local pickups as opposed to a large feeder truck.  Graham also testified that Hogan's military status had no bearing on the decision.  UPS has made similar shifts to other feeder driver routes at other UPS facilities.

In March 2003, Brown assigned feeder driver DeMotte the task of transporting packages from Sedalia to Lenexa.  This task had previously been performed by Hogan. Thereafter, Hogan's feeder driver route only involved pulling two empty trailers from Sedalia to Lenexa.

---

[2] Hogan disputes whether there was a decrease in package pickups in Sedalia during this time period.  There is no dispute that Graham asked for a study and that Lause told Graham that there was a decrease.

4

Brown eliminated several Missouri feeder driver jobs in 2003 and 2004, including four in July 2003. In July 2003, Brown eliminated Hogan's Sedalia feeder driver job. Brown testified that he never spoke to Graham about eliminating Hogan's job; though Graham did inform Meierotto that local Sedalia pickups had been eliminated from Hogan's route, and Meierotto informed Brown of the reassignment. Brown testified that he did not know Hogan was on military leave when his job was eliminated, that no one had told him it was difficult to cover Hogan's work while he was on military leave, and that no one had told him UPS needed Lehman to go back to driving a package car.

Other than Hogan, none of the feeder drivers whose jobs were eliminated were on military leave at the time their jobs were eliminated. Some of those other drivers had to transfer to other UPS facilities in order to continue working as feeder drivers because there were no junior feeder drivers they could "bump" at their facilities. Other feeder drivers who took military leave did not have their jobs eliminated. Hogan was only one of numerous UPS Missouri employees who took military leave in 2003 and 2004. Only Hogan's job was eliminated.

After Hogan's job was eliminated, Brown split up the remaining work on Hogan's job among other drivers. Brown assigned one of the trailers remaining on Hogan's job to a feeder driver in Jefferson City, Vernon Branson. Brown assigned the other trailer to a feeder driver in Lenexa. Hogan believes the work was subsequently moved to Columbia, though his only evidence in support of this belief is inadmissible hearsay. Package car drivers continued to

5

make the local pickups from the Sedalia customers from whom Hogan had made pickups. Feeder driver DeMotte, who was Hogan's senior, held the only feeder driver job in Sedalia.

### 1. Comments Concerning Covering Hogan's Route

Hogan testified that, prior to eliminating his job, several UPS managers complained that it was difficult to cover his route when he was out on military leave. According to Hogan, Laurice Phillips told him that it was difficult for UPS to move Lehman from driving package cars to cover Hogan's feeder route when he was on military leave.

Hogan also testified that, in 2001 and 2002, Lause told him repeatedly about the difficulties UPS had covering his route when he was on military leave. Lehman testified that he saw notes on Lause's clipboard concerning eliminating Hogan's position, including resulting cost savings; when he questioned her about the document later, she denied it existed.

Lehman testified that, in March or April 2003 over the course of several conversations, Meierotto told Lehman that Hogan's job would be eliminated. When Lehman asked Meierotto why, Meierotto responded that Lehman was needed back in package car and that Hogan's job was none of Lehman's concern.

Lehman also testified that, in two conversations in May to June 2003, Lehman asked Graham why he was eliminating Hogan's route, and Graham responded that Lehman needed to keep his nose out of what happened in feeders and mind his own business. Graham declares that he was not aware of any difficulty covering Hogan's work.

6

The supervisors who allegedly commented on the difficulty of covering Hogan's work did not make the decision to eliminate Hogan's position.

### D.    Collective Bargaining Agreement and Hogan's Grievance

UPS and the Teamsters were parties to a collective bargaining agreement governing the terms and conditions of UPS's Missouri hourly employees between August 2002 and July 2008.  Hogan was a member of Teamsters Local 41 during his employment at UPS.  UPS feeder drivers in Columbia are members of Teamsters Local 688, of which Hogan was never a member.

The collective bargaining agreement refers to USERRA.  Article 15 of the "Master Agreement" states:

> Employees in service in the uniformed services of the United States, as defined by the provisions of [USERRA], shall be granted all rights and privileges provided by USERRA and/or other applicable state and federal laws.  This shall include the continuation of health coverage as provided by USERRA, and pension contributions for the employee's period of service, as provided by USERRA.

[Doc. # 34, Ex. J at 35.]  Further, the collective bargaining agreement states that UPS, "in its discretion, may . . . award additional benefits to employees on leave for service in the uniformed services in excess of the requirements outlined in USERRA."  [*Id.*]

Under the collective bargaining agreement, a feeder driver whose job has been eliminated has a right to either "bump" a junior employee at his location in any job for which the driver is qualified, or to displace the least senior employee whose job he is qualified to perform in any other location within the jurisdiction of his local union.  Specifically, the collective bargaining agreement provides:

7

The Employer agrees to respect the jurisdictional rules of the Union and, except as otherwise provided in this Master Agreement . . . shall not direct or require their employees . . . other than the employees in the bargaining units here involved, to perform work which is recognized as the work of the employees in said units.

[*Id.* at 9.]

###    E.    Hogan's Reemployment

When he returned from service in April 2004, Hogan requested a feeder driver position in Sedalia; UPS informed him that his previous job no longer existed. Hogan concedes that he was not entitled to bump feeder driver DeMotte, who had more seniority, from his Sedalia feeder driver position.

Hogan requested a feeder driver job in Columbia. UPS did not offer him such a job, although there were other feeder driver jobs in Columbia occupied by employees with less seniority than Hogan. Various UPS witnesses testified that UPS did not have the authority under the collective bargaining agreement to transfer Hogan to Columbia, because it would have required UPS to transfer Hogan outside the jurisdiction of Teamsters Local 41, and allow him to "bump" another feeder driver in Columbia, who was within the jurisdiction of Teamsters Local 688.

UPS's Missouri District Labor Manager, John Samberg, decided which reemployment options UPS would offer Hogan upon his return from military service. UPS offered him the choice of three job options: (1) two part-time package handling jobs in Sedalia; (2) a package car driver job in Sedalia; or (3) a feeder driver job anywhere within Local 41's jurisdiction, based on his seniority. The first two options, package handler and package car driver, had

Case 2:08-cv-04068-NKL   Document 79   Filed 07/13/09   Page 8 of 30

a lower hourly rate of pay, had different hours and duties, and were generally – though not necessarily always – more physically demanding than feeder driver positions. UPS has presented evidence that these are the jobs which would have been available to Hogan had he not been on military leave when his job was eliminated, pursuant to the terms of the collective bargaining agreement. Hogan does not dispute that these jobs are those he would have been offered had he not been on military leave when his job was eliminated.

Hogan opted for a feeder driver position in Lenexa, Kansas, the closest center in Local 41 where he had enough seniority to qualify for the feeder driver job. Hogan's residence was approximately fifteen miles from UPS's Sedalia facility, fifty miles from its Columbia facility, and 105 miles from its Lenexa facility; his round-trip commute to Sedalia went from approximately forty minutes to approximately four hours and twenty minutes when he transferred to Lenexa. The Sedalia facility is seventy miles from the Columbia facility, and ninety miles from the Lenexa facility. Hogan worked at the Lenexa facility from April 2004 until he resigned in October 2005.

In April 2004, Hogan filed a grievance under the collective bargaining agreement, claiming that he should have been allowed to take a feeder driver job in Columbia because more than half of his work had been moved there. His grievance did not raise USERRA issues, and the grievance panel did not address such issues. The UPS/Teamsters grievance

9

panel held that Hogan did not have a right to transfer to Columbia under the collective bargaining agreement because his job had been eliminated rather than transferred.[3]

### F. Complaint

#### 1. Timing

While he was on military leave, Hogan contacted his Teamsters Local Business Agent and inquired about the status of his route. After speaking with the business agent and various co-employees in the summer of 2003, Hogan was under the impression that his feeder driver route had been moved to Columbia only temporarily. Hogan spoke to the Department of Labor about his USERRA rights in March 2003. Though he apparently suspected as much sooner, UPS management did not inform Hogan that UPS had permanently eliminated his Sedalia feeder driver job until he returned from military leave and requested reemployment on April 6, 2004. He filed his claim on April 3, 2008.

#### 2. Content

Hogan's Complaint includes two separate Counts. Count I, titled "Discrimination," states that UPS's decision to eliminate his feeder driver route was motivated in part by Hogan's military service in violation of USERRA, 38 U.S.C. § 4311. Count II, titled "Re-Employment," alleges that UPS denied Hogan a benefit of his prior position – namely, location – in violation of USERRA, 38 U.S.C. § 4312. The Complaint's Prayer for Relief requests that the Court: declare that UPS violated USERRA as stated in Counts I and II;

---

[3] UPS concedes that the decision on Hogan's grievance has no *res judicata* or collateral estoppel impact on the instant case.

Case 2:08-cv-04068-NKL   Document 79   Filed 07/13/09   Page 10 of 30

require UPS to reemploy Hogan in a position of like pay, status and benefits as that in which he would have been absent his military service; lost wages and benefits; an injunction preventing UPS from taking further action against Hogan in violation of USERRA; and prejudgment interest.

## II. Discussion

UPS moves for summary judgment on Count I, Hogan's discrimination claim, as well as Count II, Hogan's reemployment claim. Hogan moves for summary judgment on Count II alone.

In its motion for summary judgment, UPS argues as to Count I: (1) Hogan's claims are barred by the four-year federal statute of limitations; (2) Hogan cannot establish that UPS was motivated by Hogan's military service in eliminating his job; and (3) UPS would have eliminated Hogan's job regardless of his military service. As to Count II, Hogan's reemployment claim, UPS argues that it complied with USERRA by reemploying Hogan in the job he would have had if he had been working when his job was eliminated.

In his motion for partial summary judgment on Count II, Hogan argues that (1) USERRA protects military service members' interests in location of employment, (2) the applicable collective bargaining agreement allowed and required UPS to accord Hogan his rights under USERRA so as to reemploy Hogan as a feeder driver in Columbia, and (3) even if the collective bargaining agreement did not so require, that agreement cannot limit Hogan's rights under USERRA. The Court will consider UPS's statute of limitations argument and Hogan's claims in turn.

Case 2:08-cv-04068-NKL   Document 79   Filed 07/13/09   Page 11 of 30

## A.     USERRA

Congress enacted USERRA in 1994 to: (1) encourage noncareer participation in military service; (2) minimize the disruption caused by military service on the lives of service members, their employers, fellow employees, and communities by providing prompt reemployment of returning service members; and (3) prohibit discrimination based on military service. *See* 38 U.S.C. § 4301. Toward those ends, USERRA prohibits employers from discriminating against military service members based on their military status, *see* 38 U.S.C. § 4311, and – subject to certain limitations – requires employers to rehire service members upon their return from duty, *see* 38 U.S.C. § 4312. Because USERRA is intended to protect the rights of military service members, it must be construed broadly and "in favor of its military beneficiaries." *Clegg v. Arkansas Dep't of Corr.*, 496 F.3d 922, 931 (8th Cir. 2007) (citation omitted); *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 286 (1946) (considering USERRA predecessor statute and stating, "This legislation is to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need.").

## B.     Statute of Limitations

As a threshold matter, UPS argues that Hogan's discrimination claim is barred by a four-year statute of limitations. UPS states that Hogan learned his job had been eliminated in 2003, and that he contacted the Department of Labor to discuss his rights under USERRA in March 2004. Because Hogan did not file this lawsuit until April 2008, UPS argues that his claims are time-barred. It appears that UPS directs this argument at Count I of Hogan's

12

Complaint. Hogan responds that (1) no statute of limitations applies to his claims and (2) even if a four-year statute applies, his Complaint was timely.

USERRA's history has created some disagreement as to whether claims brought under the statute are subject to a statute of limitations. Until October 2008, USERRA expressly precluded the application of any *state* statute of limitations, though it did not address the applicability of *federal* statutes of limitation. *See* 38 U.S.C. § 4243(i) (1998) ("Inapplicability of State statute of limitations. – No State statute of limitations shall apply to any proceeding under this chapter."). This pre-October 2008 version of USERRA was in effect when Hogan filed his claim in April 2008.

Courts were split on what, if any, statute of limitations applied to USERRA cases filed under this pre-October 2008 version of USERRA. Several courts found that the general federal four-year statute of limitations must apply. *See generally*, 28 U.S.C. § 1658(a). *See, e.g., Wagner v. Novartis Pharm. Corp.*, 565 F. Supp. 2d 940, 945-46 (E.D. Tenn. 2008); *Aull v. McKeon-Grano Assoc., Inc.*, No. 06-2752 (HAA), 2007 WL 655484, at *4 (D. N. J. Feb. 26, 2007); *O'Neill v. Putnam Retail Mgmt. LLP*, 407 F. Supp. 2d 310, 316 (D. Mass. 2005). Some of those courts reasoned that USERRA did not expressly bar application of the federal statute of limitations like it expressly barred application of state statutes of limitations. *See, e.g., Wagner*, 565 F. Supp. 2d at 944. Those courts acknowledged that the 1990 federal statute of limitations states that civil claims arising under federal laws which were enacted after 1990 are subject to a four year limitations period unless those laws exclude the statute of limitations. *See id.* In *Jones v. R.R. Donnelly & Sons Company*, 541 U.S. 369 (2004), the

13

Court stated that causes of action arise under legislation enacted after 1990 if the plaintiff's claims were made possible by a post-1990 enactment. *See id.* Because USERRA expanded rights accorded by predecessor statutes, various courts held USERRA claims subject to the four-year federal statute of limitations in § 1658. *Wagner*, 565 F. Supp. 2d at 944. However, other courts turned not to the federal statute of limitations but to the equitable doctrine of laches alone to determine the timeliness of USERRA suits, and did not apply the federal statute of limitations. *See McLain v. City of Somerville*, 424 F. Supp. 2d 329, 336 (D. Mass. 2006); *Garcia v. Department of State*, 101 M.S.P.R. 172, 178 (M.S.P.B. 2006) (finding that the legislative history of USERRA and its predecessor "makes it clear that since 1940, Congress has never imposed limitation periods on the adjudication of claims under these statutes and has intended that the equitable doctrine of laches be applied to such claims"); *Harper v. Department of Navy*, 101 M.S.P.R. 166, 170 (M.S.P.B. 2006) (rejecting application of *Jones* to USERRA actions against a government employer); 20 C.F.R. 1002.311 (acknowledging that courts have held otherwise, but stating that USERRA does not have a statute of limitations). *Cf. Wagner*, 565 F. Supp. 2d at 942 (declaring 20 C.F.R. § 1002.311 void to the extent the Department of Labor sought to exempt USERRA from the valid § 1658 enacted by Congress). No Eighth Circuit court considered the applicability of a statute of limitations to USERRA cases under the version of USERRA in effect when Hogan filed his case.

Congress amended USERRA as of October 2008 to provide, "If any person seeks to file a complaint or claim with the Secretary, the Merit Systems Protection Board, or a Federal

or State court under this chapter alleging a violation of this chapter, there shall be no limit on the period for filing the complaint or claim." 38 U.S.C. § 4327(b) (2008). Under this amendment, any action filed after October 2008 would not be subject to a statute of limitations defense, regardless of when the relevant factual events occurred.

Because Hogan filed this action before the October 2008 amendment, the Court must apply the pre-amendment version of the statute. The Court finds persuasive those cases applying the federal statute of limitations to such cases. The issue, then, is whether Hogan filed his claim within four years of its accrual.

Hogan argues that his claim did not accrue until April 6, 2004, when UPS officially notified him that his job had been permanently eliminated. Though Hogan testified that he had spoken to others about his job being moved or eliminated prior to April 2004, he also testified to his belief that UPS' actions could have been temporary. Though Hogan contacted the Department of Labor concerning his USERRA rights in March 2004, the Department of Labor notes of that contact – submitted by UPS – indicate that Hogan did not know exactly what reemployment UPS would offer him and give no indication that the Department of Labor thought a claim had accrued at that point. UPS has submitted no evidence that Hogan knew or should have known of the alleged discrimination prior to April 6, 2004, when it informed him it had permanently eliminated his job. His April 3, 2004, Complaint was timely. *See generally Potts v. Howard Univ. Hosp.*, — F. Supp. 2d —, No. 2009 WL 1609361 (D. D. C. Jun. 10, 2009) (finding that USERRA cause of action accrued when the plaintiff was issued a right to sue letter).

15

### C.    Count I - Discrimination

UPS argues that it is entitled to summary judgment on Count I because Hogan cannot establish that his job was eliminated because of his military service.  In *Maxfield v. Cintas Corp. No. 2*, 427 F.3d 544 (8th Cir. 2005) ("*Maxfield I*"), the Eighth Circuit clarified the burdens of proof allocated in USERRA discrimination cases:

> USERRA, enacted in 1994 to improve the Veterans' Reemployment Rights Act ('VRRA'), prohibits employment discrimination on the basis of military service.  An employer violates USERRA when a person's membership in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, or obligation for service.  Unlike the *McDonnell Douglas* framework utilized in Title VII claims, the procedural framework and evidentiary burdens set out in section 4311 shift the burden of persuasion, as well as production, to the employer.  Under USERRA, an employee must make an initial showing that military status was at least a motivating or substantial factor in the employer's action.  If the employee makes such a showing, the employer must prove, by a preponderance of evidence, that the action would have been taken despite the protected status.

*Id.* at 551 (citations and internal punctuation omitted).  "[M]ilitary status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1239 (11th Cir. 2005) (citation and original punctuation omitted).  In other words, if the employer was asked at the moment the adverse employment decision was made what the reasons for that decision were and was forced to answer candidly, one of those reasons would be the employee's military obligations. *See Tranter v. Cresent Twp.*, 2:06-cv-355-TFM, 2007 WL 3274158, *3 (W.D. Pa. Nov. 5, 2007).  As in other discrimination cases, to prevail at summary judgment in a USERRA case, an employer must show "that its defense is so strong

Case 2:08-cv-04068-NKL   Document 79   Filed 07/13/09   Page 16 of 30

that any reasonable jury must accept it." *See Maxfield v. Cintas Corp., No. 2*, 487 F.2d 1132, 1138 (8th Cir. 2007) ("*Maxfield II*").

In determining whether a service member's military status was a motivating factor in an employer's action, "all record evidence must be considered." *Maxfield I*, 427 F.3d at 552 (quoting *Sheehan v. Department of Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001)). "For example, 'discriminatory motivation under the USERRA may reasonably be inferred from ... proximity in time between the employee's military activity and the adverse employment action [and] inconsistencies between the proffered reason and other actions of the employer.'" *Id.* "Circumstantial evidence will often be a factor in these cases, for discrimination is seldom open or notorious." *Sheehan*, 240 F.3d at 1014.

UPS argues that Hogan cannot establish that its alleged discriminatory actions were motivated in part by his military service. It states that, even if Hogan could establish a prima facie case, he cannot overcome the evidence indicating that it eliminated his job for valid business reasons. UPS focuses on the evidence that Brown alone made the decision to eliminate Hogan's job without input from any of the supervisors that Hogan argues commented on his military leave. UPS states that Brown did so to increase efficiency. Even if Graham was the effective decisionmaker in transferring the local Sedalia pickups off Hogan's route, UPS says there is no evidence that Graham was motivated by military animus, that Graham knew what percentage of Hogan's work the local Sedalia pickups comprised, or that Graham knew Hogan was on military leave when he transferred the local Sedalia

17

pickups. Thus, UPS argues it is entitled to summary judgment on Hogan's discrimination claim.

Sometimes, even if the individual who made an adverse employment decision did not discriminate, an employer may still be held liable if that individual was acting as a "rubber stamp" for the actions of a discriminating subordinate; this is known as the "cat's paw" theory of liability. *See generally Quamhiyah v. Iowa State Univ. of Sci. & Tech.*, 566 F.3d 733, 742 (8th Cir. 2009). The Eighth Circuit recently reviewed its case law on the theory, and although it did not yet "define the precise level of control biased subordinates must exert over decision-makers," it did determine that an employer may only be liable under the "cat's paw" theory, if the decisionmaker "served as the conduit, vehicle, or rubber stamp by which another achieved his or her unlawful design." *Id*. at 742, 745 (finding, in a Title VII action, that an independent review of the employee by the ultimate decisionmakers insulated the employer from "cat's paw" liability despite evidence that those ultimate decisionmakers considered the reviews of lower-level employees who may have had discriminatory motives).

Under an apparent "cat's paw" theory of liability, Hogan argues that Graham, not Brown, effectively made the decision to eliminate Hogan's job when he transferred the local Sedalia pickups to package car drivers. Hogan argues that Graham was influenced by Hogan's military status, as was Lause, who was part of Graham's management team. Hogan surmises that Graham transferred the local pickups off of Hogan's route in an effort to eliminate that route altogether. Hogan argues that, because Brown's job involved attempting

to eliminate unnecessary feeder routes and to improve efficiency, it was inevitable that he would eliminate Hogan's job once Graham transferred the local Sedalia pickups.

However, there is insufficient evidence from which a jury could find either that Graham was motivated by Hogan's military status or that Brown acted as Graham's paw. Graham testified that he relied on his personal observations, as well as on reports given to him by Lause and other management team employees. It is undisputed that a substantial amount of work remained on Hogan's route after the pickups were eliminated. Graham also testified that he did not know that Hogan's route would be eliminated as a result of eliminating the local pickups, and there is no evidence indicating that he should have known otherwise. Though Brown stated he would have considered the pickups in his analysis, there is no evidence supporting Hogan's contention that eliminating the local pickups made elimination of his route a "done deal"; there is no evidence that Brown would have reached a different decision had the pickups not been eliminated. There is also no evidence indicating that Graham and Brown ever communicated about the elimination of Hogan's route, or any other connection between Graham and Brown.

It was only after Brown's independent review of Hogan's route that the job was eliminated. Brown was charged with increasing efficiency and determined that using feeder trucks differently would be more efficient. This was a logical conclusion given the difference in size between the feeder trucks and the package trucks which took over the work. Brown also eliminated several feeder driver jobs during the relevant time period, and only Hogan's involved a military service member. Brown did not know Hogan, and did not

19

know that Hogan was on military leave. *See generally Culton v. Missouri Dep't of Corr.*, 515 F.3d 828, 831 (8th Cir. 2008) (stating, in a Title VII retaliation action, that failure to present any evidence that the decisionmaker was aware of the employee's protected activities was fatal to the claim). Brown did not eliminate the routes of other feeder drivers who also took military leave. Hogan suggests that there is a dispute as to which UPS manager eliminated his job, but has presented no evidence on which a reasonable jury could base a decision that any subordinate used Brown to carry out unlawful discrimination or that Brown eliminated Hogan's job for any reason other than the need to improve efficiency. Hogan has not met his burden of showing that his military service was a motivating factor in the elimination of his job, and UPS has shown that it would have eliminated his job even if he had not taken military leave. UPS is entitled to summary judgment on Count I.

### D. Count II - Reemployment

Both parties move for summary judgment on Count II of Hogan's Complaint, his reemployment claim. In support of its motion, UPS argues: (1) it was not required to reemploy Hogan as a feeder driver in Sedalia, as that position had been eliminated; (2) it was not required to reemploy Hogan in Columbia because to do so would have been in violation of a collective bargaining agreement; and (3) it satisfied USERRA's requirements by reemploying Hogan in a feeder driver position in Lenexa, as that is the job to which he would have been entitled had he been continuously working in 2003 when it eliminated his job. Hogan argues that the collective bargaining agreement allowed UPS to reemploy him as a feeder driver at its Columbia location and, thus, it was required to do so by USERRA;

20

further, Hogan argues that USERRA requires UPS to employ him at the closest location to his prior job – Columbia – and states that the collective bargaining agreement's provisions cannot trump USERRA's requirements regarding location.

This issue of whether USERRA requires an employer to reemploy a returning service member in a specific location regardless of collective bargaining provisions appears to be one of first impression. To resolve this issue, the Court must examine the tension between USERRA's "escalator principle" and UPS's collective bargaining agreements.

### 1. Escalator Principle

USERRA provides that employers must reemploy service members who have been absent from work for more than ninety days due to service in "the position of employment in which the person would have been employed if the [service member's] continuous employment had not been interrupted . . ., or a position of like seniority, status, and pay . . . . " 38 U.S.C. § 4313(a)(2)(A). 20 C.F.R. § 1002.191 sets forth this obligation, known as the "escalator principle":

> As a general rule, the employee is entitled to reemployment in the job position that he or she would have attained with reasonable certainty if not for the absence due to uniformed service. This position is known as the escalator position. The principle behind the escalator position is that, if not for the period of uniformed service, the employee could have been promoted (or, alternatively, demoted, transferred, or laid off) due to intervening events. The escalator principle requires that the employee be reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of service. Depending upon the specific circumstances, the employer may have the option, or be required, to reemploy the employee in a position other than the escalator position.

*Id.* (emphasis added). *See also* 38 U.S.C. 4331(a) (authorizing regulations corresponding to USERRA).[4]  To determine whether a reemployment position reflects with reasonable certainty the 20 C.F.R. 1002.191 "benefits" that a service member would have had if continuously working:

> The term "benefit", "benefit of employment", or "rights and benefits" means any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment.

38 U.S.C. § 4303(2).

20 C.F.R. § 1002.192 states that the "starting point" for determining the proper reemployment position is the escalator position, but – depending on factors such as the employee's length of service, qualifications, and disability –, "[t]he reemployment position may be either the escalator position; the pre-service position; a position comparable to the escalator or pre-service position; or, the nearest approximation to one of these positions." *Id.* 20 C.F.R. § 1002.194 considers the possibility of adverse consequences resulting from application of the escalator principle:

> The Act does not prohibit lawful adverse job consequences that result from the employee's restoration on the seniority ladder. *Depending on the circumstances, the escalator principle may cause an employee to be reemployed in a higher or lower*

---

[4]  The Court must give effect to Department of Labor regulations which reasonably interpret USERRA.  *See generally Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (stating that Department of Labor regulations concerning compensation were entitled to such deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)).

*position, laid off, or even terminated.* For example, if an employee's seniority or job classification would have resulted in the employee being laid off during the period of service, and the layoff continued after the date of reemployment, reemployment would reinstate the employee to layoff status. Similarly, the status of the reemployment position requires the employer to assess what would have happened to such factors as the employee's opportunities for advancement, working conditions, job location, shift assignment, rank, responsibility, and geographical location, if he or she had remained continuously employed. *The reemployment position may involve transfer to another shift or location,* more or less strenuous working conditions, or changed opportunities for advancement, depending upon the application of the escalator principle.

*Id.* (emphasis added).

### 2.    Interplay between USERRA and Employer Contracts/Practices

USERRA expressly supersedes contracts which limit the rights it guarantees. 38 U.S.C. § 4302 provides:

> This chapter supersedes any State law (including any local law or ordinance), contract, agreement, policy, plan, practice, or other matter that reduces, limits, or eliminates in any manner any right or benefit provided by this chapter, including the establishment of additional prerequisites to the exercise of any such right or the receipt of any such benefit.

*Id.* (stating also that nothing in USERRA shall supersede, nullify or diminish any contract that establishes a right or benefit that is more beneficial to those provided by USERRA).

Applying this statute, several courts have found that collective bargaining agreements cannot abrogate rights accorded by USERRA. For example, in *Russell v. Merit Systems Protection Board*, No. 2008-3106, 2008 WL 5999727 (Fed. Cir. Nov. 18, 2008) (per curiam), the court found that a collective bargaining agreement's failure to exclude USERRA claims from its exclusive claims resolution procedures "amount[ed] to an impermissible attempt to subordinate individual rights under USERRA to majoritarian collective bargaining

23

processes." *Id.* at *3 (citation omitted) (finding that a service member's statutory right to appeal her reemployment matter was not affected by a collective bargaining agreement's requirement that she follow a union grievance process). *See also Garrett v. Circuit City Stores, Inc.*, 449 F.3d 672, 680 (5th Cir. 2006) (considering whether § 4302 applies to arbitration agreements and finding, based on legislative history, that Congress intended the section "to prohibit the limiting of USERRA's substantive rights by union contracts and collective bargaining agreements") (citing, *inter alia*, *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275 (1946); *Beckley v. Lipe-Rollway Corp.*, 448 F. Supp. 563 (N.D.N.Y. 1978) (holding that a USERRA predecessor statute required a reemployed veteran to receive pension credits despite contrary policies derived from terms of a collective bargaining agreement and pension plan)); *Wrigglesworth v. Brumbaugh*, 129 F. Supp. 2d 1106, 1110 (W.D. Mich. 2001) (finding that USERRA's guaranty of continuing benefits trumped a retirement plan's provisions stating that military service members would not receive pension credit for military service time).

However, where collective bargaining agreements do not run directly contrary to USERRA, they should be considered in determining appropriate reemployment positions. Under 20 C.F.R. 1002.193, an escalator position should be determined with reference to "seniority, status and pay" provided by collective bargaining agreements:

> The reemployment position includes the seniority, status, and rate of pay that an employee would ordinarily have attained in that position given his or her job history, including prospects for future earnings and advancement. . . . *The seniority rights, status, and pay of an employment position include those established (or changed) by a collective bargaining agreement* . . . . The sources of seniority rights, status, and

24

pay include agreements, policies, and practices in effect at the beginning of the employee's service, and any changes that may have occurred during the period of service.

*Id.* (emphasis added). Here, the parties appear to agree that job location is a function of job "status" as discussed in USERRA.

Considering a USERRA predecessor statute, the *Fishgold* Court confirmed that employers should reference collective bargaining agreements when determining appropriate reemployment positions. *See Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275 (1946). In *Fishgold*, a returning service member argued that his employer violated the statute when it treated non-service members more favorably than him. When available work was reduced, the employer laid off employees – including the service member – according to their seniority; the seniority and the employer's layoff procedures were prescribed by the terms of a collective bargaining agreement. *Id.* at 280. Addressing the service member's argument that laying off a service member equated to an illegal "discharge," the *Fishgold* Court clarified that the statute did not require employers to favor returning service members over non-service-member employees with more seniority. *Id.* at 286. The *Fishgold* Court stated:

> Congress made the restoration as nearly a complete substitute for the original job as was possible. No step-up or gain in priority can be fairly implied. Congress protected the veteran against loss of ground or demotion on his return.

*Id.* The *Fishgold* Court also noted, "There is indeed no suggestion that Congress sought to sweep aside the seniority system. What it undertook to do was to give the veteran protection within the framework of the seniority system . . . ." *Id.* at 288. *See also Goggin v. Lincoln*

25

*St. Louis*, 702 F.2d 698, 703 (8th Cir. 1983) (confirming that returning service members are not entitled to greater seniority than they would have had under collective bargaining agreements than they would have had absent service).[5]

### 3.        Application of the Escalator Principle to Hogan

There are two issues concerning Hogan's reemployment claim. The first is whether USERRA requires UPS to reemploy Hogan in the closest physical location to Sedalia regardless of the collective bargaining agreement provision stating that UPS cannot move employees across local union lines. The second is whether the collective bargaining agreement does permit UPS to reemploy Hogan across local union lines such that USERRA requires it to do so.[6]

---

[5] Returning service members may "bump" present employees who are working in their place during military leave. *See* H.R. Rep. No. 103-65, pt. 1, at 32 (1993) (stating that employers of returning service members may need to "bump" employees hired to fill the service members' absence) (as quoted in *Fannin v. United Space Alliance, L.L.C.*, No. 6:07-cv-1315-Orl-DAB, 2009 WL 928302, at *6 (M.D. Fla. April 3, 2009); *Rogers v. City of San Antonio*, 392 F.3d 758, 763 (5th Cir. 2005) (noting that employers may have to reassign or give notice to incumbent employees who occupy the returning service member's position). It is no defense to an USERRA failure to reemploy claim that an employer would have had to "bump" a present employee working in place of a service member in order to reemploy a returning employee in an escalated position. *Goggin*, 702 F.2d at 703. Here, Hogan does not seek to bump other employees working in his stead; he seeks to bump employees on routes entirely different from the one he drove when he entered service, and on routes to which he would not have been entitled had he been continuously employed.

[6] Again, the relevant portions of the collective bargaining agreement in this case state: (1) as to USERRA rights:

Employees in service in the uniformed services of the United States, as defined by the provisions of [USERRA], shall be granted all rights and privileges provided by USERRA and/or other applicable state and federal laws. This shall include the continuation of health coverage as provided by USERRA, and pension

26

As to the first issue, UPS argues that the collective bargaining agreement is not directly contrary to USERRA and, thus, the agreement must be the source for determining appropriate reemployment location. The agreement does provide that UPS shall comply with USERRA. UPS argues that it did comply with USERRA's requirements – by offering Hogan job(s) at locations where he undisputedly would have been entitled to work had he been continuously employed. UPS emphasizes that USERRA allows for the possibility of job transfer, or even layoff, under application of its escalator principle. UPS notes that there is no evidence that it treated Hogan any differently than other feeder drivers whose jobs were eliminated in determining his reemployment position.

In response, Hogan concedes that application of the escalator principle requires reference to collective bargaining agreements for purposes of determining seniority. Specifically, Hogan concedes that he would not be entitled to bump feeder driver DeMotte out of his Sedalia feeder driver position, as DeMotte has more seniority than Hogan under the terms of the collective bargaining agreement. There is no doubt that DeMotte's position

<div style="border-top: 1px solid; width: 30%;"></div>

contributions for the employee's period of service, as provided by USERRA.
[Doc. # 34, Ex. J at 35]; and:

[UPS] in its discretion, may . . . award additional benefits to employees on leave for service in the uniformed services in excess of the requirements outlined in USERRA.

[*Id.*]; and (2) as to employees crossing local union lines:

The Employer agrees to respect the jurisdictional rules of the Union and, except as otherwise provided in this Master Agreement. . . shall not direct or require their employees . . . other than the employees in the bargaining units here involved, to perform work which is recognized as the work of the employees in said units.

[*Id.* at 9.]

Case 2:08-cv-04068-NKL   Document 79   Filed 07/13/09   Page 27 of 30

is the closest approximation to Hogan's prior job as a feeder driver in Sedalia. Still, Hogan argues that the Court should not look to the collective bargaining agreement for purposes of job location in the same way it looks to the agreement for purposes of seniority.

However, the language of USERRA requires reemployment in a position of like "seniority" in the same breath as it requires a position of like "status." As argued by Hogan, "status" includes job location. USERRA – and the regulations – make no distinction between the two categories. Hogan does not explain why the collective bargaining agreement should control seniority considerations but not location/status considerations, and the Court sees no logical reason for treating them differently. Thus, under USERRA, Hogan is entitled to reemployment in the job locations where he would have had employment under the terms of the collective bargaining agreement. In other words, the Court does not find that USERRA requires the Court to ignore the collective bargaining agreement to determine what rights Hogan would have had if he had not been in military service. This is not a case where the collective bargaining agreement is depriving Hogan of a right - such as the right to appeal - guaranteed by USERRA. The collective bargaining agreement is merely being consulted to determine what his status would be absent his military service.

Next, Hogan argues that, even if USERRA required determination of job location with reference to the collective bargaining agreement, the agreement affirmatively required UPS to reemploy him as a feeder driver at its Columbia location. The agreement does provide that UPS has discretion to award greater rights than those provided "by USERRA." [Doc. # 34, Ex. J at 35.] However, the plain language of the agreement does not indicate that UPS may

Case 2:08-cv-04068-NKL   Document 79   Filed 07/13/09   Page 28 of 30

award greater rights than those provided *by the agreement* when granting greater rights than those provided *by USERRA*. The agreement simply does not state that its provisions concerning "seniority, status and pay" do not apply to returning services members. The absence of such language indicates that, even when awarding greater rights than those provided by USERRA, UPS must comply with the collective bargaining agreement.

The collective bargaining agreement is not contrary to USERRA, and does not require or allow UPS to employ returning service members outside their local unions. By the terms of the collective bargaining agreement Hogan is not entitled to reemployment in Columbia, which is outside the jurisdiction of his local union. To read the contract as advanced by Hogan would require the Court to read in language that is not there and to reach an interpretation that would be contrary to the logical intent of the parties.

## III.    Conclusion

The Court has reached its conclusions in this case cautiously, recognizing that the elimination of Hogan's job placed him in a different position than he would have been if his job had been preserved and filled with another - even more senior - UPS employee. However, the Court is bound to follow USERRA as written and the collective bargaining agreement as stated and logically interpreted. In addition, the Court cannot rely on speculation that Hogan's military status played a role in the elimination of his job.

Accordingly, it is hereby ORDERED that UPS's Motion for Summary Judgment [Doc. # 33] is GRANTED. Hogan's Motion for Partial Summary Judgment [Doc. # 38] is DENIED.

Case 2:08-cv-04068-NKL   Document 79   Filed 07/13/09   Page 29 of 30

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: July 13, 2009
Jefferson City, Missouri